# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
### No 21-0970V

|  |  |
|---|---|
| M.F.,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: February 15, 2024<br>Refiled as Redacted: April 5, 2024 |

*John Robert Howie, Howie Law, PC, Dallas, TX,* for Petitioner.

*Zoe Wade, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On February 22, 2021, M.F. filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a left shoulder injury related to vaccine administration ("SIRVA") following her receipt of a pneumococcal conjugate ("Prevnar 13") vaccination on June 12, 2020. The case was assigned to the Office of Special Masters ("OSM")'s Special Processing Unit ("SPU").

In April 2023, I issued a Ruling on Entitlement for the Table SIRVA claim, consistent with Respondent's recommendation (ECF Nos. 31, 33). However, the parties could not reconcile their valuations of Petitioner's past pain and suffering, and they submitted briefing on the subject. Petitioner's Motion for a Ruling on the Record on

---

[1] When this decision was originally filed, I advised my intent to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), Petitioner filed a timely motion to redact certain information. This decision is being posted with Petitioner's name redacted and replaced with initials. Except for those changes and this footnote, no other substantive changes have been made. This decision will be posted on the court's website with no further opportunity to move for redaction.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Damages filed July 31, 2023 (ECF No. 40) (hereinafter "Brief"), Respondent's Response filed Oct. 12, 2023 (ECF No. 42); Petitioner's Reply filed Oct. 27 (ECF No. 43). The matter is now ripe for adjudication.

**For the following reasons, I find that Petitioner is entitled to compensation in the total amount of $83,435.00 (representing $82,500.00 for past pain and suffering, and $935.00 for past unreimbursable medical expenses).**

## I. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining damages, and how to properly evaluate prior SIRVA compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *McKenna v. Sec'y of Health & Hum. Servs.*, No. 21-0030V, 2023 WL 5045121, at *1-3 (Fed. Cl. Spec. Mstr. July 7, 2023).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

## II. Appropriate Compensation for Petitioner's Pain and Suffering

### A. Consideration of the Evidence

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult, with no impairments to her mental faculties or capacity. I therefore analyze principally the severity and duration of Petitioner's injury. In performing this analysis, I have reviewed the record as a whole, including all medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I also have taken into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and I rely upon my experience adjudicating these cases. However, I base my ultimate determination on the specific circumstances here.

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

At the time of vaccination, Petitioner was middle-aged, with "no prior history of left shoulder pain and dysfunction." Response at 2. But the parties agree on the "significan[ce]" of another preexisting medical condition for Petitioner: "Primary biliary cholangitis [hereinafter "PBC"] [which] is a long-term (chronic) liver disease… [which] destroys the tube-like structures (bile ducts) in the liver that produce the digestive fluid called bile. Bile is necessary for absorbing fats, cholesterol, and fat-soluble vitamins. As bile ducts are destroyed, bile backs up in your liver and causes liver damage. It can lead to scarring of the liver (cirrhosis)… [PBC] may be an autoimmune disease." Ex. 7 at 178, cited in Reply at 3[4]; *see also* Response at 2 (stating that Petitioner's PBC was "significant").

Pre-vaccination medical records confirm Petitioner's PBC diagnosis – and that as early as 2012, a liver specialist instructed Petitioner to "avoid any" OTC medications. Ex. 3 at 31. Petitioner was also warned of "hepatoxic medicines… damaging to the liver when taken too often or in excessive amounts. These can include… [OTC] and prescription medicines." Ex. 7 at 179. Petitioner was therefore instructed to consult with her health care providers about taking any new medicines in the context of her PBC, as well as possible contraindications for the drug taken to manage it – ursodiol. *Id.* at 56 – 57.

Petitioner received the at-issue pneumococcal vaccine in her left arm at a local pharmacy on Friday, June 12, 2020. Ex. 2 at 6.

Two days later, on Sunday, June 14, 2020, Petition arrived at an urgent care facility, with a chief complaint of pain and an inability to move her left arm since the vaccination two days earlier. Ex. 10 at 12. Petitioner "state[d] that she has a liver disorder and [is] unable to take OTC medications so she ha[d] not taken anything for her symptoms." The current pain was "excruciating," and she was seeking urgent care to avoid "further damage[e]." *Id.*

A physical examination found "evidence of injection" in the left upper arm just below the shoulder joint; tenderness to palpation over the injection site and posterior to it; and minimal range of motion ("ROM") with abduction to about 20 degrees with discomfort. Ex. 10 at 12. The urgent care physician assessed "pain status post-injection," and discussed that an x-ray imaging would not confirm the presence or absence of nerve, tendon, or ligament injuries. *Id.* at 13. The urgent care physician suggested managing the injury with rest, ice, compression, elevation, and OTC pain medicines until Petitioner could "follow up with her primary care provider ("PCP") for further eval." Ex. 10 at 13.

---

[4] *Accord* U.S. Department of Health & Human Services - National Institute of Diabetes and Digestive and Kidney Diseases, *Primary Biliary Cholangitis*, https://www.niddk.nih.gov/health-information/liver-disease/primary-biliary-cholangitis (last accessed Feb. 13, 2024), cited in Brief at 2.

3

The next contemporaneous documentation is Petitioner's June 22, 2020, report to the Vaccine Adverse Event Reporting System ("VAERS"), concerning her vaccination and subsequent pain. Ex. 11 at 2. Based on her own research, she suspected that the vaccine was not properly administered. *Id.* at 2. Petitioner did not recount the urgent care encounter – but stated: "Presently I still have pain and limited [ROM] in my left arm. I have a future appointment with a neurologist." *Id.*[5]

On July 7, 2020, Petitioner presented to the University of Texas ("UT") Physicians Department of Neurology, where she completed a patient history form for a chief complaint of shoulder pain. Ex. 12 at 16 – 21. The evaluating neurologist recorded that Petitioner "was in normal health until 6/12/20 when she began to develop left arm weakness following a [pneumococcal] vaccine… *The symptoms have mostly resolved*. She had pain at the site, but denies any associated numbness… The sensation that a 'hinge' in her shoulder was loose… Pain was fine if arm was at her side, but exacerbated if she extended her left arm. She also reports some decreased [ROM] of her left upper extremity since the vaccine." *Id.* at 24 (emphasis added). A physical examination confirmed currently "decreased [ROM] [and…] pain with extension of left arm." *Id.* at 24, 26. The neurologist suspected that these symptoms had a musculoskeletal etiology, for which she recommended an orthopedics evaluation. *Id.* at 26.[6]

On September 15, 2020, orthopedist Bonnie Gregory, M.D., also affiliated with UT Physicians, evaluated Petitioner's same complaint. Ex. 12 at 42. The pain was currently sharp, occasional, worse with activity, and rated 5/10. *Id.* On physical examination, the left shoulder was tender at the bicipital groove and subacromial bursa, with restricted ROM and positive painful arc, Hawkins, and Neer's tests. *Id.* at 43. X-rays were unremarkable. *Id.* The orthopedist's assessment was adhesive capsulitis, for which she recommended physical therapy ("PT") – adding: "If persistent pain despite PT, will obtain MRI left shoulder." *Id.* at 44.[7]

---

[5] For purposes of resolving Petitioner's SIRVA damages award, it is unnecessary to resolve whether she sought a neurology evaluation of her own accord, or at the instruction of a primary care provider as she alleges, *see* Ex. 1 at ¶ 6. Because even if the neurology evaluation somewhat delayed the diagnosis of a musculoskeletal injury, it did not delay any appropriate treatment thereof – given that Petitioner declined any medicines and postponed PT for several months to avoid potentially contracting COVID-19.

[6] Petitioner suggests that on July 7, 2020, she completed an *additional* patient history form, which is found at Ex. 12 at 2 – 3. However, the form is undated – and it states that Petitioner had *already* seen a neurologist for this problem. *Id.* at 2. Thus, Petitioner may have completed this form in conjunction with her later orthopedics or sports medicine evaluations, also within the UT Physicians network. *See* Ex. 12 at 42 – 44, 48 -51.

[7] Respondent's Response at 3, cites to this orthopedic evaluations records as embedded in the primary care records, at Ex. 3 at 57 – 59.

On September 21, 2020, Petitioner attended a hepatology appointment for management of her PBC. Ex. 7 at 191. She reported that after receiving a pneumococcal vaccine a few months ago, she had developed persistent left shoulder pain and difficulty lifting her arm vertically (but the complaint was not examined or assessed, by these unrelated specialists). *Id.* at 192. Petitioner asked about the "permissib[ility] from a liver standpoint" about 1) steroids to relieve her left shoulder pain, recommended by an unspecified physician, and 2) an unrelated medication for an unrelated issue, recommended by her obstetrician-gynecologist. *Id.* The hepatologists did not document any answer about steroids – but expressly approved the second unrelated medication, albeit with monitoring. *See id.* at 194 ("If she is administered [the second unrelated medication], an ALT and GGT at 3 and 6 months would be useful…").

Also on that same day, Petitioner telephoned the orthopedics practice requesting to "go ahead and get the MRI [of her left shoulder] scheduled." Ex. 12 at 45. That MRI, performed on October 15, 2020, revealed adhesive capsulitis, mild tendinosis of the supraspinatus and infraspinatus tendons, minimal subacromial-subdeltoid bursitis, and a small glenohumeral joint effusion. *Id.* at 46.

On October 27, 2020, at an annual exam with her established primary care provider, Petitioner again complained about her left shoulder. Ex. 3 at 14. On exam, the shoulder had limited ROM with extension to 90 degrees, abduction to 70 degrees, and "severe rigidity of the left shoulder AC joint." *Id.* at 15. The PCP assessed adhesive capsulitis. *Id.* While the PCP's records do not indicate a treatment plan, that same day, she certified that PT was medically necessary to treat this injury. *See* Ex. 14 at 54.

On October 30, 2020, sports medicine specialist Peter Sabonghy, M.D., also affiliated with UT Physicians, recorded Petitioner's consistent history of a post-vaccination left shoulder injury, with her current pain characterized as sharp, intermittent, increased with activity, and rated 10/10. Ex. 12 at 48. On physical exam, Petitioner's left shoulder had minimal tenderness with deep palpation, pain upon abduction and forward flexion with internal rotation; and pain upon stress testing of the supraspinatus. *Id.* at 49 – 50. The shoulder also displayed decreased ROM with 10 degrees external rotation, 100 degrees forward flexion, and 80 degrees abduction. *Id.* at 50.[8] The assessments were adhesive capsulitis, impingement syndrome, and rotator cuff tendonitis and strain. *Id.* The sports medicine specialist's recommendations were OTC NSAIDs, rest, ice, and PT. *Id.* The sports medicine specialist also noted that Petitioner was "unable to have steroid

---

[8] Normal shoulder ROM for adults ranges from 90 to 100 degrees in external rotation, 70 to 90 degrees in internal rotation 165 to 180 degrees in flexion, and 170 to 180 degrees in abduction. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016).

5

injections," and they had discussed "the possibility of surgery… if [Petitioner] continues to have sufficient symptoms and loss of [ROM]." *Id.* at 51.

During a November 23, 2020 telehealth encounter, on physical exam Petitioner was "unable to raise left arm vertically above her head (secondary to injection given in her shoulder." Ex. 7 at 222. However, no further assessment or treatment plan of the shoulder was offered – as the encounter was with medical specialists focused on managing Petitioner's PBC and supporting her request to work from home during the following school semester. *Id.* at 222 – 23.

At her March 15, 2021, PT initial presentation, Petitioner reported being "dx w/ SIRVA." Ex. 14 at 5. She reported initial "extreme" pain and inability to move her arm, which had "slowly gotten better" and she had "learned not to use LUE [left upper extremity] for activities." *Id.* She had "refused corticosteroid injections 2/2 to congenital liver disease and… report[ed] sleep disturbance with need for pillow support." *Id.* Over the past two weeks, her left shoulder pain had ranged from 1 – 10/10 (being worse with activity). *Id.* at 5, 53. Physical examination of the left shoulder again revealed tenderness to palpation, decreased ROM, again decreased strength. *Id.* at 6 -7. The therapist instructed Petitioner on a home exercise program ("HEP"). *Id.* at 10. Over the course of eight total formal PT sessions in the next two months, Petitioner had overall achieved "excellent progress, demonstrating good, improved shoulder ROM." Ex. 14 at 43. Her active ROM had not returned to the normal range, which would benefit from additional skilled PT. *id.* But after the 8th PT session on May 26, 2021, Petitioner was a repeated "no-show," could not be contacted at her provided phone number, and she was discharged from the PT practice. *Id.* at 47.

In January 2022, Petitioner saw her established primary care provider regarding a COVID-19 and/or sinusitis infection, for which she was given a prescription for Tramadol to take for up to seven days. Ex. 15 at 10 – 11.

The next primary care record, from February 2022, supports that Petitioner had recovered from her acute illness. As part of an annual evaluation, a physical exam of the left shoulder revealed slightly decreased ROM – with 150 degrees in extension and 110 degrees in flexion. Ex. 15 at 13. But the record does not contain any history relating back to the 2020 vaccination, and the provider's assessment was "sprain of rotator cuff capsule, *initial encounter*, exercise recommended." *Id.* at 15 (emphasis added). No additional medical records evidence Petitioner's SIRVA pain and suffering.[9]

---

[9] Petitioner initially stated that a January 2022 hepatology encounter documented a current complaint and physical exam findings of a left shoulder injury. Brief at 15 – 16 (citing Ex. 16 at 1 – 4). But Respondent argues in reaction that these details were carried over from previous medical records, and thus do not

In September 2021, Petitioner reviewed the above medical history, and stated that her PBC diagnosis and the Pandemic both complicated her ability to treat her SIRVA. *See, e.g.*, Ex. 1 (ECF No. 11-1) at ¶¶ 3, 6, 11, 14, 23. In July 2023, Petitioner thereafter submitted a second statement with additional detail about her pain and suffering. *See generally* Ex. 17 (ECF No. 39-1).[10]

### B.  Analysis

The medical record evidence reflects that Petitioner's immediate shoulder pain was severe, as evidenced by her urgent care encounter just two days after the June 12, 2020, vaccination.

Respondent emphasizes the neurology record from three weeks post-vaccination which indeed provides that Petitioner's "symptoms have mostly resolved." Response at 5, citing Ex. 12 at 24. This is hardly a gross misrepresentation of the evidence at that time, as Petitioner argues (*see* Reply at 2), but the neurology record overall is hard to parse – as it frames many of Petitioner's statements in the past tense, and then the physical exam confirms the current existence of pain and decreased ROM, which warranted an orthopedics evaluation and imaging. Later medical records, however, document that Petitioner continued to experience ongoing shoulder pain, which was "intermittent" in the sense that she was limiting her activity in reaction, to minimize the pain she felt. That pain became severe with movement, her ROM remained limited, and she was later diagnosed with adhesive capsulitis (which is commonly understood to develop as a result of such pain-protective behaviors).

The medical treatment of Petitioner's shoulder was overall spotty – primarily consisting of conservative management, pain-protective behaviors, limited evaluations, imaging, and just eight formal PT sessions occurring about nine to eleven months post-vaccination. But Petitioner has identified additional relevant circumstances - including that the Pandemic made it more difficult to schedule medical appointments; she had a particularized fear of contracting COVID-19 because of her PBC; and she wanted to consult with her PBC specialists about whether any medications or steroid injections for her shoulder might be appropriate.

---

support a claim of ongoing left shoulder symptoms. Response at 5 – 6. Petitioner's Reply does not address this point. I agree with Respondent's analysis that the January 2022 hepatology encounter does not evidence an ongoing left shoulder injury, or active treatment thereof, that can be incorporated into the SIRVA damages award.

[10] Both statements are sworn under penalty of perjury as permitted under 28 U.S.C.A. § 1746.

I further agree that Petitioner's PBC is a "unique" fact, reflected throughout the medical records, that helps explain why she did not utilize any pain medicines or steroid injection to address her SIRVA. Respondent has not successfully rebutted that explanation by pointing to an isolated, seven-day prescription for Tramadol. *See* Response at 6. There is no evidence that Petitioner actually filled and/or took the Tramadol prescription – and I agree that it is distinguishable from an ongoing reliance on pain medications for a shoulder injury lasting for over six months.

The medical records also reflect that after eight PT sessions, eleven and one-half months post-vaccination, Petitioner had achieved "excellent" progress. Ex. 14 at 43. Although additional PT was recommended – specifically based on some ongoing limitations in active ROM – Petitioner did not return for any further PT, and I find that her explanation for that decision is unhelpful. *See* Ex. 17 – Second Sworn Statement at ¶ 15 (describing her "paranoi[a]" that a therapist would disclose her medical history throughout the community, in addition to fears about the COVID Delta variant). There is also insufficient evidence to conclude that Petitioner's SIRVA and residual effects persisted much beyond the last PT encounter, just under one year post-vaccination.

Petitioner maintains that her SIRVA resulted in past pain and suffering which warrants an award of $85,000.00. *See generally* Brief, Reply. She compares her case to "*Desrosiers*, involving a pregnant petitioner who… was unable to avail herself of standard treatment modalities[11] and *Boyd*, involving a petitioner who declined steroid injections due to underlying [diabetes]." Brief at 25.[12] Petitioner also argues that she should receive a higher sum than what was awarded in *Boyd* because that petitioner's initial shoulder pain was less severe, as evidenced by the initial one-month delay in medical record documentation, despite two intervening encounters. *Id.*

In contrast, Respondent proposes that I award an *unspecified* lower amount, based on my analysis of the evidence presented. Apart from disputing Petitioner's contention that her PBC prevented her from utilizing pain medicines or steroid injections, however, Respondent does not seek to distinguish the Petitioner's case from *Boyd* and *Desrosiers* – or maintain that any other past cases are more fitting comparisons. Thus, Respondent's objection to Petitioner's demand – "give her less" – provides me with very little to go on, leaving me to consider mainly the arguments and evidence offered by Petitioner in support of her demand.

---

[11] *Desrosiers v. Sec'y of Health & Hum. Servs.*, No. 16-0224, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for "past and future pain and suffering"). But here in *M.F.,* I expressly determine that only an award for *past* pain and suffering is warranted.

[12] Citing *Boyd v. Sec'y of Health & Hum. Servs.*, No. 19-1107V, 2021 WL 4165160 (Fed. Cl. Spec. Mstr. Aug. 12, 2021) (awarding $80,000.00 for past pain and suffering).

I conclude that Petitioner's past pain and suffering valuation is overall supported by her evidence, briefing, and case citations – but that a *slightly* lower sum is justified (albeit not because of any reasoned argument put forward by Respondent).[13] **Accordingly, Petitioner will be awarded $82,500.00 for past pain and suffering.**

## Conclusion

For all the reasons discussed above and based on consideration of the entire record, **Petitioner is entitled to damages in the form of a lump sum payment of $83,435.00 (representing $82,500.00 for past pain and suffering, and $935.00 for past unreimbursable medical expenses).**[14]

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[15]

**IT IS SO ORDERED.**                              **s/Brian H. Corcoran**
                                                    Brian H. Corcoran
                                                    Chief Special Master

---

[13] I admonish Respondent in future cases to propose, and attempt to defend, what he deems an appropriate award in a disputed action – whatever that sum might be – rather than simply refuse to accept Petitioner's proposal. If it becomes Respondent's practice to express obstinance on these questions, it will become far more likely that, absent circumstances specific to the case before me, Petitioner will simply receive what is demanded.

At the same time, however, Petitioner and her counsel are reminded that civility is paramount, when pursuing either informal resolution or the Court's formal adjudication of cases. Overheated rhetoric is more likely to be distracting than persuasive on the actual merits of the case. *See, e.g.*, Reply at 2 (alleging "glaring, bald-faced misrepresentations of the evidence"); *id.* at 7 (arguing against "a hypothetical fairyland…"); *id.* at 7 (making a comparison to "3rd graders on the playground").

[14] The parties have stipulated to the expenses. Response at 5; Reply at 14.

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.